369 So.2d 1320 (1979)
STATE of Louisiana
v.
Sharon RUDOLPH.
No. 63227.
Supreme Court of Louisiana.
April 9, 1979.
*1321 Arthur A. Lemann, III, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise S. Korns, Asst. Dist. Atty., for plaintiff-appellee.
BLANCHE, Justice.
On November 25, 1975, defendant was charged by bill of information with violation of LSA-R.S. 14:95.1 (possession of a firearm having previously been convicted of felony). On September 14, 1977, she withdrew her plea of not guilty and entered a plea of guilty to the charged crime, reserving her right to appeal errors which allegedly occurred during pretrial proceedings. On January 27, 1978, she was sentenced to serve three years at hard labor and to pay seventy dollars in court costs, in default of payment thereof to serve ten days in the parish prison.
Officer Robert J. McNeil of the Narcotics Division of the New Orleans Police Department testified at the pretrial hearing on motions to quash the bill of information and to suppress certain evidence that on the evening of March 24, 1975, he and fellow Officer Barrere received a telephone call from a reliable confidential informant who told the officers that Alfred Carter, known as "Goldie," was at 2705 Belmont Street, Apartment E (the defendant's residence), with a couple of juveniles, in the process of adulterating, or cutting, approximately five *1322 ounces of heroin and that thereafter Carter was going to move the rest of the heroin to another location for retail distribution at a later date. The informant stated that Carter was almost finished with this process and was preparing to move the heroin to his stash pad at 2909 Clara Street, Apartment C, the residence of his paramour, Delores McDowell.
The officers knew that Alfred Carter lived in the project at 2708 Belmont Street, Apartment C, across from 2705 Belmont, Apartment E, where he allegedly was located at that time. Further, they verified the fact that Delores McDowell lived at 2909 Clara Street, Apartment C, which was just around the corner from the other two apartments.
Officers McNeil, Barrere, Kirkpatrick and Coe checked Carter's residence and found it in darkness. Delores McDowell's residence at 2909 Clara Street, Apartment C, was also found in total darkness. However, at 2705 Belmont Street, Apartment E, they found the lights on and the curtains drawn and decided that possibly Carter was still there cutting the heroin. All three residences were then placed under surveillance.
According to Officer McNeil, at about 11:00 P.M. Officers Kirkpatrick and Coe, who had been observing the defendant's apartment, notified McNeil and his partner by radio that they had seen a woman and two young men leave the defendant's apartment and walk toward Clara Street. A moment or two after receiving the message McNeil and Barrere caught sight of the trio. McNeil testified that the three walked in single file with the woman in the middle and that the woman had her hand inside her coat as if to secrete something within. He further stated that the two men stood on each side of the doorway acting as sentries as the woman unlocked the door and entered the residence at 2909 Clara, Apartment C, and then followed her inside. The lights inside were turned on momentarily and then immediately turned off.
Officer McNeil further related that a short time later they were contacted by the narcotics office and told that the confidential informant had contacted the office apparently with more information. Officers McNeil and Barrere left the scene to make contact with the confidential informant. On this occasion, Officer Barrere talked with the informer who told him that the heroin had been moved to 2909 Clara Street, Apartment C. The informant said that the surveillance had been detected and that: McDowell had called Carter and informed him of the surveillance; Carter had told McDowell to put the heroin in a place of easy disposability; Carter was going to get his machine gun in order to protect his investment from the police.
McNeil testified that the officers were fearful that Carter would provoke a deadly fray in order to protect the heroin. This fear was based upon an altercation which occurred in January of 1975 when they executed a search warrant in the 2700 block of Sixth Street at the residence of Ronald Hughes and Jessie Gleason, reputed functionaries of Carter, and seized approximately fifty-eight dosage units of heroin. Officer McNeil's partner was wounded and Hughes was killed in an exchange of gunfire during the raid. According to McNeil, when the police later executed a search warrant at Carter's residence, they seized numerous weapons, as well as letters wherein Carter expressed a desire to avenge the death of his friend by the police officers.
According to McNeil, the officers deemed the circumstances "exigent" and devised a plan to seize the heroin and arrest the defendant. Officers from the New Orleans Police Department, Sixth District, in marked vehicles with their lights and sirens on, were called to the scene on the pretext of investigating a shooting. When the Sixth District officers entered the Clara Street apartment under the guise of making inquiries about the fabricated shooting, Officer McNeil and other narcotics officers entered immediately behind, advised McDowell of her rights and told her they believed that she was in possession of firearms and contraband. A machine gun and a large *1323 quantity of heroin was seized and McDowell placed under arrest. The officers then set out to arrest Carter, feeling, according to McNeil, that they needed to locate him as quickly as possible.
After checking Carter's residence and learning that he had not been home all evening, the officers went to the defendant's residence, the address where Carter had allegedly cut up the heroin earlier. When they arrived, they heard loud music coming from inside. According to McNeil, the officers knocked and announced their authority but got no response. McNeil further testified that after knocking a second time, they heard someone running, whereupon they broke down the door and arrested Carter as he was running into the bedroom. The defendant was also in the apartment, and a shotgun, reported to have been on the bed, was seized.
At Carter's trial, the defendant herein testified on behalf of Carter that the shotgun seized in her apartment that night did not belong to Carter, but rather belonged to her. Following Carter's trial, defendant was charged with violating R.S. 14:95.1 on the basis of her in-court testimony. She subsequently pled guilty, reserving a right to appeal certain pretrial rulings of the trial court.
While the defendant assigned as error the lower court's denials of her motions to quash, to withdraw her plea of guilty and to suppress, only the portion of her motion to suppress seeking to have the evidence which was seized at her apartment during the arrest of Carter has been briefed and argued before this Court. Hence, those assignments which were neither briefed nor argued are deemed abandoned. State v. Wientjes, 341 So.2d 390 (La.1976); State v. Phillips, 337 So.2d 1157 (La.1976); State v. Matthews, 292 So.2d 226 (La.1974); State v. Edwards, 261 La. 1014, 261 So.2d 649 (La. 1972).
The defense assigns as error the failure of the trial court to suppress the weapon, claiming that it was seized as a result of an invalid, warrantless search of her apartment. The State contends that the seizure was valid since they had probable cause to arrest Carter, the circumstances were exigent and the gun seized was in plain view, or, in the alternative, was seized incident to the arrest of Carter. The defense, on the other hand, contends that since the weapon was seized without a warrant, the State must show some exceptional circumstance to validate the seizure. They further claim that the seizure cannot be validated by reference to the plain view doctrine since none of the three criteria for its application, as set down by this Court in State v. Fearn, 345 So.2d 468 (La.1977), and State v. Parker, 355 So.2d 900 (La.1978), are present in this case.
In State v. Fearn, supra, this Court followed the United States Supreme Court in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and held:
"The conditions necessary for the applicability of the exception [plain view] are: (1) there must be a prior justification for an intrusion into a protected area, (2) in the course of which evidence is discovered inadvertently, and (3) where it is immediately apparent without close inspection that the items are evidence or contraband.. . ." (State v. Fearn, 345 So.2d at 470)
It is axiomatic that, absent one of the well-delineated exceptions, a warrantless search or seizure is per se unreasonable under the Fourth Amendment of the United States Constitution and Article 1, § 5 of the Louisiana Constitution of 1974. Coolidge v. New Hampshire, supra; State v. Daigre, 364 So.2d 902 (La.1978); State v. Guzman, 362 So.2d 744 (La.1978); State v. Colvin, 358 So.2d 1250 (La.1978); State v. Parker, supra. Also, the State has the burden of proving that a warrantless search and seizure was justified. State v. Wilkerson, 367 So.2d 319 (La.1979); State v. Brown, 366 So.2d 550 (La.1978); State v. Franklin, 353 So.2d 1315 (La.1977).
As noted above, in order for the plain view doctrine to apply, there must be a prior justification for the intrusion into *1324 the protected area. State v. Fearn, supra. Since no search warrant for the defendant's residence was obtained, the State must show some exceptional circumstance which would provide a justification for the officers entering the defendant's apartment. The State relies wholly upon the theory that the police had probable cause to arrest Carter for the commission of a felony, that they had information which caused them to reasonably believe Carter was in the defendant's residence, and that circumstances were exigent since they reasonably feared Carter would escape and/or provoke a deadly fray with the police if he found out they had seized his heroin.[1] Under these circumstances, the State claims it could forcibly enter the defendant's home to effect an arrest upon Carter and that it was unnecessary for them to obtain an arrest warrant to do so.
The threshold issue is whether the officers had probable cause to arrest Carter. See State v. Franklin, 353 So.2d 1315 (La. 1977); State v. Ranker, 343 So.2d 189 (La. 1977).
In State v. Thomas, 349 So.2d 270, 272 (La.1977), we set forth the principles applicable to warrantless arrests:
"A warrantless arrest, no less than an arrest pursuant to a validly issued warrant, must be based on probable cause. State v. Ranker, 343 So.2d 189 (La.1977); State v. Jackson, 337 So.2d 508 (La.1976); State v. Scott, 320 So.2d 538 (La.1975); State v. Terracina, 309 So.2d 271 (La. 1975); State v. Odom, 292 So.2d 189 (La. 1974). Probable cause exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); State v. Marks, 337 So.2d 1177 (La.1976); State v. Randolph, 337 So.2d 498 (La.1976); State v. Gilmore, 323 So.2d 459 (La.1975); State v. Wood, 262 La. 259, 263 So.2d 28 (1972). While the officer need not have sufficient proof to convict, mere suspicion is not enough to justify an arrest. State v. Ranker, supra; State v. Randolph, supra.

"LaFave `Street Encounters' and the Constitution: Terry, Sibron, Peters and Beyond, 65 Mich.L.Rev. 40, 73-74 (1968) observes:
`As to the probability required for an arrest, it may generally be stated that it must be more probable than not that the person has committed an offense, although this is less certain as to the probability that a particular person is the offender than to the probability that a crime has been committed by someone. In the latter situation, which assumes central importance when there is no doubt who the offender is if a crime has been committed, courts ordinarily require that criminal conduct be more probable than noncriminal activity. This approach is reflected in those decisions which say that there must be "more evidence for [the existence of criminal conduct] than against" or that the suspect's actions must be "inconsistent with any innocent pursuit," and also in the many cases where grounds for arrest have been found lacking because the conduct of the suspect was equivocal, that is, where the possibility of criminal conduct was no greater than the possibility of innocent behavior.' (Footnotes omitted.)"
State v. Thomas, supra at 272; see also State v. Ranker, supra, State v. Franklin, supra.
In examining the evidence in this case, we conclude that the critical element is the information given by the confidential informant with whom Officer McNeil had been in contact.[2] While a police officer *1325 may arrest a person without a warrant if he has reasonable cause to believe that the person has committed an offense, Code of Criminal Procedure Article 213, the defendant may request a probable cause determination before an independent magistrate who must determine whether the facts and circumstances known to the arresting officer and of which he had reasonably trustworthy information were sufficient to justify a man of ordinary caution in believing that the person arrested had committed a crime. State v. Marks, supra.
In Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the United States Supreme Court held that when a search warrant is based solely on hearsay, the affidavit must indicate some of the underlying circumstances on which the informant bases his conclusions and some of the circumstances supporting the informant's credibility. In State v. Paciera, 290 So.2d 681 (La.1974), this Court held:
"If we can deduce a rule from these cases, it is this: The affidavit submitted to the magistrate may be based entirely upon hearsay, but, if so, it must set forth underlying circumstances and details sufficient to provide a substantial factual basis by which the magistrate might find reliable both the informant and the information given by him. Factors which support the credibility of an un identified informant include prior accurate reports or any specific independent corroboration of the accuracy of the instant report. Factors which support the credibility of the information reported include (a) direct personal observation by the informant, or (b), if the information came indirectly to the informant, the reasons in sufficient factual detail for the magistrate to evaluate and credit the reliability both of the indirect source and of the indirectly-obtained information. . . ." (State v. Paciera, 290 So.2d at 685-686)
See also State v. Smith, 350 So.2d 1178 (La.1977); State v. Linkletter, 286 So.2d 321 (La. 1973).
This Court has applied these same principles in cases where the hearsay statements of a confidential informant form the basis for probable cause to arrest in determining whether an arrest was valid. State v. Gipson, 359 So.2d 87 (La.1978); State v. Edwards, 351 So.2d 500 (La.1977); State v. Ranker, supra; State v. Marks, 337 So.2d 1177 (La.1976). Likewise, the requirements apply equally to a hearing called to test the constitutionality of an arrest without a warrant as they do to such a hearing challenging an arrest where a warrant was obtained.
Thus, at the hearing on the motion to suppress in the instant case, the burden was on the State to show that the confidential informant was credible and that the information given was reliable. We conclude the State carried its burden.
The State introduced sufficient evidence from which the trial judge could conclude both that the confidential informant was credible and the information reliable. We agree that the mere assertion by the police that an informer is reliable is insufficient to establish his credibility. However, we believe that the information given by the informant was sufficiently corroborated by independent investigation as to establish the credibility of the informant.[3]State v. Mena, 344 So.2d 357 (La. 1976); State v. Paciera, supra.
*1326 Officer McNeil testified that they knew Carter lived at 2708 Belmont, Apartment C, which was across the street from 2705 Belmont, Apartment E, the defendant's apartment. They also determined that Delores McDowell lived at 2909 Clara, Apartment C. The police were also aware that Carter was a known heroin distributor. Before taking any action, the police undertook a surveillance of the two residences referred to by the informer (where the heroin was and where Carter intended to move it) and Carter's residence. The police then observed what appeared to be what the informer had told them would occura transfer from the defendant's residence to the McDowell residence. This was confirmed by a second contact with the informer who indicated that the heroin had been moved to the McDowell residence. We believe that the highly detailed character of the informant's information, together with the independent investigation by the police combined to demonstrate the informant's credibility.
We also find the testimony of Officer McNeil was sufficient to establish the reliability of the information. This Court has held that personal observation by the informant of the persons and events about which he reports to the police is sufficient to establish the reliability of the information. State v. Hysell, 364 So.2d 1300 (La.1978); State v. Paciera, supra. In interpreting the officer's testimony in a common sense manner, the information supplied by the informant was of such detail and so current that it can be inferred that the informant could only have known it as a result of personal observation. Cf. State v. Marks, supra, at 1182.
We, therefore, conclude that based upon the information supplied by the informant, coupled with the police officers' past experience with Carter and their independent investigation on that particular night, the police had probable cause to arrest Carter for possession of heroin with intent to distribute. We make this determination without consideration of the evidence seized in the search of McDowell's apartment.[4]
Even though we find probable cause to exist, nevertheless, the intrusion would not be justified unless we find that the police could rightfully forcibly enter the defendant's residence to effect a warrantless arrest of Carter. In State v. Ranker, 343 So.2d 189 (La.1977), this Court expressed grave doubts as to the constitutionality of Louisiana Code of Criminal Procedure Article 213(3) as applied to an unauthorized entry of a dwelling to effect a warrantless arrest under non-exigent circumstances.[5] See also State v. Smith, 352 So.2d 216 (La.1977). In that case, however, we found it unnecessary to decide that issue since we found no probable cause to have existed to believe the person arrested had committed a crime. Today, we also find it unnecessary to decide the ultimate issue since we believe sufficient exigent circumstances existed in this case to justify the warrantless intrusion.
This Court held in State v. Smith, supra, that the possibility that the person to be arrested might escape, with or without a dangerous confrontation, constitutes exigent circumstances warranting the intrusion if the police have reasonable grounds to believe the person to be arrested is in the suspected dwelling. Here, there is no question that the officers had reasonable grounds to believe Carter was in the defendant's residence. Further, after the officers knocked twice and announced their authority, they heard the sound of someone running inside. We believe that under these circumstances they could reasonably conclude that Carter may have been attempting to escape. In addition to the possibility *1327 of escape, an additional element further convinces us that the actions of the police were justified. Testimony established that the police had already had one deadly altercation with persons associated with Carter, that a search of Carter's residence had produced numerous weapons as well as letters by Carter indicating a desire by Carter to avenge the death of a friend killed in a shootout with police and that Carter had vowed to protect his investment in the heroin from seizure by the police. The record convinces us that the police were justified in their conclusion that their actions were necessary to prevent another deadly altercation with Carter.
Considering all of these circumstances, we believe that once the police were refused admittance after knocking and announcing their authority, they were justified in forcibly entering the defendant's apartment.[6]
Having determined that the police had a prior justification for the intrusion into the defendant's residence, the next question is whether the discovery of the shotgun was inadvertent. We conclude that it was. Officer McNeil testified that the sole purpose of the entry into the defendant's residence was to arrest Carter. This is borne out by the fact that the heroin and the machine gun had already been recovered at the McDowell residence. The weapon was discovered on the bed during the course of the arrest. We, therefore, find that the discovery was inadvertent.[7]
The final inquiry is whether it was "immediately apparent without close inspection that the items [were] evidence or contraband." State v. Fearn, supra. Carter was arrested, according to uncontradicted testimony, running into the bedroom where the shotgun lay on the bed. We believe the shotgun was rightfully seized as evidence for whatever charges may have been subsequently brought against Carter.
Having carefully examined the facts of this case in light of the three-pronged test for the application of the plain view doctrine set forth by the court in State v. Fearn, supra, we conclude that the seizure of the shotgun from the apartment of the defendant was proper and that the trial judge committed no error in denying defendant's motion to suppress.

DECREE
The conviction and sentence of the defendant are affirmed.
AFFIRMED.
NOTES
[1] We note briefly that the State did not contend that it was seeking any contraband in the defendant's home under some exception to the warrant rule. Officer McNeil testified that the sole reason they entered the defendant's residence was to arrest Carter.
[2] The following would be a summary of facts known to the officers at the time of the search of McDowell's residence where the heroin and machine gun were seized without the informer's tips. (1) Alfred Carter was a suspected heroin dealer. (2) On the night in question the lights were out at his residence and that of Delores McDowell and the lights were on and shades drawn at Sharon Rudolph's residence. (3) Two men and a woman left Sharon Rudolph's residence and walked single file to Delores McDowell's residence. (4) The two men stood on either side of the door while the female opened the door, then they followed her inside. (5) The lights went on, then went off again.
[3] Other evidence which tends to establish the credibility of the informant is the fact that he has previously supplied information which has led to arrests and/or convictions. State v. Hysell, 364 So.2d 1300 (La.1978); that the information supplied is a declaration against the penal interest of the informer, State v. Welsh, ___ So.2d ___ (La. 1979), No. 62,907; State v. Weinburg, 364 So.2d 964 (La.1978); State v. Anderson, 357 So.2d 547 (La.1978); State v. Mena, 344 So.2d 357 (La.1976); that the informer is ready and willing to testify in court to the facts which he or she has supplied to the police, State v. Welsh, supra.
[4] We, therefore, express no opinion as to whether exigent circumstances existed sufficient to justify the warrantless search of McDowell's apartment and the subsequent seizure of a quantity of heroin and a machine gun.
[5] LSA-C.C.P. art. 213(3) purports to authorize warrantless arrests whenever the officer has reasonable cause to believe the person to be arrested has committed an offense.
[6] The forcible entry after being refused admittance is allowed under Code of Criminal Procedure Article 224, which provides:

"In order to make an arrest, a peace officer, who has announced his authority and purpose, may break open an outer or inner door or window of any vehicle, watercraft, aircraft, dwelling or other structure, movable or immovable, where the person to be arrested is or is reasonably believed to be, if he is refused or otherwise obstructed from admittance. The peace officer need not announce his authority and purpose when to do so would imperil the arrest."
[7] Defense counsel claims that the discovery could not be inadvertent since the warrantless intrusion was planned. This argument might be stronger if the object of the planned warrantless intrusion had been the shotgun and/or the intrusion had not been justified under the circumstances. We find the argument to be without merit.